### LANGLEY et al. v. STONDALL LAND & INVESTMENT CO.

(Circuit Court of Appeals, Eighth Circuit. February 17, 1920.)

No. 5402.

1. **Judgment** ⬅️744—**Matters litigated in former action are concluded.**

Where a land company, suing in the name of and on behalf of one of its purchasers, recovered judgment against the occupant, which was affirmed by the highest state court, and the occupant abandoned writ of error sued out of the federal Supreme Court on acquisition through several transfers of the rights of the purchaser, the occupant cannot, in a subsequent action by land company for specific performance of a contract to buy the land from its own purchaser, relitigate claims to premises asserted in the previous action.

2. **Vendor and purchaser** ⬅️187—**Where payment at fixed date was waived, payment must be made within reasonable time.**

Where, after expiration of the period fixed for payment of the amounts due under a contract for the sale of land, the parties treated the contract

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

as still in force, there was a waiver of the requirement that payment be made within the time fixed, and it is sufficient if payment be made within a reasonable time thereafter.

**3. Vendor and purchaser ⬤185—Right under contract of purchase held lost for nonpayment.**

Where complainant land company, having sold land, was unable to put the purchaser in possession, and while it was litigating title contracted with the purchaser to buy the land, payment to be completed November 1, 1913, the land company, where it failed to complete payments, and in 1917 refused to state when it would finish paying for the land, title to which was still in litigation, lost all rights under the contract.

**4. Champerty and maintenance ⬤7(1)—Contract for the sale of land held void, as champertous.**

Where a land company was unable to put buyer into possession, and in his name undertook to litigate the title, a contract between the land company and its purchaser for resale of the land to the company, made while title was still being litigated, and while the adverse claimant was in possession, is champertous, and is void, under Comp. Laws N. D. 1913, § 9406; the land being located within that state.

Appeal from the District Court of the United States for the District of North Dakota; Charles F. Amidon, Judge.

Bill by the Stondall Land & Investment Company against Charles T. Langley and others. From a decree for complainant, defendants appeal. Reversed, with instructions to dismiss the bill.

On January 16, 1908, through a writing dated November 19, 1907, the Stondall Land & Investment Company contracted with Andrew Schmidt to convey to him, by warranty deed, the north one-half of section 11, township 138, range 106 west, in North Dakota, upon the payment to it of $5,760, payable $1,920 in cash, and five deferred annual payments, each of $768, with 6 per cent. interest, and all taxes subsequent to 1907. John Johnstone had been in actual, exclusive, physical possession of this land since 1906, claiming under a similar contract of purchase from a remote grantor of the company, dated in 1906 and recorded in June, 1907, and he has at all times since maintained such possession. This Johnstone contract covered the entire section, of which only the north half is here involved. Being unable to secure possession, Schmidt refused, after the initial cash payment, to make further payment. May 10, 1911, Schmidt executed to the company a repurchase option, which expired without action. In September, 1912, the company, in the name of Schmidt, itself, and others in the line of title to it, and on the expressed behalf of Schmidt, brought suit against Johnstone to quiet title in him to this land. April 1, 1913, Schmidt executed to the company a second option, under which he gave them the right to purchase this land within seven months, on payment to him of $400 cash, and $3,600 on or before November 1, 1913. In July, 1913, the above action was brought to trial, resulting, in August, 1913, in a decree adjudging that Johnstone had "no estate or interest in, or lien or incumbrance upon, or right to the possession or use and occupation of the said land," and restraining him from "in any way interfering with the rights of the plaintiffs and from claiming or asserting any right, title, estate or estates in or lien or incumbrance upon said premises adverse to the plaintiffs or any of them." It was further decreed that, "as against the defendant, the plaintiffs, other than Andrew Schmidt, are the owners in fee simple, and entitled to the immediate possession of the said north half (N. ½) of section eleven (11), township one hundred thirty-eight (138) north, range one hundred six (106) in Golden Valley county, North Dakota, for the use and benefit of plaintiff Andrew Schmidt, and the title of the said plaintiffs, other than Andrew Schmidt, in and to the said lands, is hereby forever quieted and confirmed as against the defendant and all persons claiming under or through

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

him, and they are forever enjoined from in any wise asserting any claim thereto adverse to the said plaintiffs."

From this decree Johnstone appealed to the state Supreme Court, which affirmed the lower court. 31 N. D. 53, 153 N. W. 293. From this decision Johnstone sued out a writ of error to the Supreme Court of the United States. Under the last option contract the company made no further payments before November 1, 1913, at which date the option by its terms ended, but both the company and Schmidt thereafter treated the sale arrangement as binding. There was no further agreement or understanding as to when the deferred payments should be due, or in what amounts. The attitude of Schmidt was that of continual pressure for payment, while that of the company was to postpone and pay as little as possible. This attitude of the company was evidently controlled by its desire to know the final result of the above suit before paying any more than it had to in order to hold Schmidt.

The payments actually made by it were as follows: November 21, 1913, $100; December, 1913, $50; May 5, 1914, $100; June 30, 1914, $400; December 1, 1914, $50; June 5, 1915, $200; January 14, 1916, $400. More than four months after the last of these payments, totaling $1,300 of the $4,000 due, Schmidt's attorney wrote another urgent letter demanding further payment, to which the company replied that it could not state when it could make a further payment, but as soon as the above suit was determined in the United States Supreme Court it would make a loan on the land and pay Schmidt in full. Within a few weeks thereafter, Schmidt sold and conveyed his interest in the land, all claims for rents and damages for the use and occupation thereof, and all rights, interests, and the judgment arising out of the above action, to one Langley, who was in reality an agent of Johnstone, for $3,000, which sum slightly exceeded the estimated balance, with interest, due Schmidt under the contract of sale to the company. A few days after this conveyance, Langley completely satisfied the judgment in the above case. Shortly after this satisfaction of judgment, Langley conveyed the land to William Johnstone, the son of John Johnstone, who took and holds the title for his father. November 20, 1917, the Supreme Court of the United States dismissed Johnstone's writ of error, in pursuance of rule 10 of that court (36 Sup. Ct. v). 245 U. S. 678, 38 Sup. Ct. 64, 62 L. Ed. 543.

In November, 1916, the company filed its bill herein against Langley to secure specific performance of the above contract of sale to it. In May, 1917, it filed the amended bill upon which the case was tried, wherein it made the Johnstones defendants, and prayed the specific performance of the option contract of April 1, 1913, and the cancellation of the contract of sale by it to Schmidt. The answer of Langley to this amended bill incorporates by reference his answer, not in this transcript, to the original bill; but he may be disregarded as a party in the determination of this cause, as there is no claim that he then had, or now has, any right, title, or interest in the land. The separate answers of the Johnstones are identical in effect. They set up the continued possession of John Johnstone, under his contract in 1906 with plaintiff's predecessor in title; that no action has ever been brought to contest that possession of this north half-section of land; that in 1909 the company's predecessor in title prosecuted actions for the benefit of itself and assigns, including the company, for the other two quarters of the section; that the above Schmidt Case was prosecuted to cancel the Johnstone contract and to quiet title to this north half-section, but that possession of said land was not sought therein; that this last action, while prosecuted nominally for the benefit of Schmidt, was in reality for its own use and benefit, and that it was the real party in interest; that the company had but one cause of action for the entire section of land, and was barred from prosecuting the Schmidt Case by reason of there having been prosecuted to judgment the two prior actions for other portions of said section. They further answered that at the trial of the Schmidt Case the option contract of April 1, 1913, was introduced, but that the company claimed that it was only a nominal party to that action; that in findings of fact procured by the company in that action the court found that Schmidt had fully complied with his contract of purchase from the company, and that the company had no claim or interest.

in or to the land, except as trustee for Schmidt; that in the judgment therein, procured by the company, the court decreed cancellation of the Johnstone contract, and quieted the title in Schmidt; that the assignments from Schmidt to Langley were procured with knowledge of such findings and judgment, and with knowledge that they had been procured at the instance of the company, and that reliance was based thereon; that, having taken such a position in that cause, the company is now estopped to claim that it had or has any interest through the above option contract; that such action amounts to a rescission of the option contract, and such a claim would now be inequitable. They further plead that the company treated Schmidt unfairly and fraudulently, and obtained his consent and signature to the option contract by misrepresentation and fraud. They further answer that, at the time the company contracted to sell this land to Schmidt, it knew of Johnstone's adverse possession, but that Schmidt made the first payment of $1,-920 without such knowledge, and relying upon the representations of the company; that neither possession nor repayment of this sum had been tendered by it to Schmidt, nor had it attempted to obtain possession for Schmidt, until it had secured the option contract for repurchase; that the consideration under the option was grossly inadequate; that after obtaining the option it instituted the Schmidt suit, falsely pretending such was for the benefit of Schmidt, when the suit was really for its benefit; that its purpose in this Schmidt suit was to deprive both Schmidt and Johnstone of the land, because it had doubled in value. They further answer that the company never accepted nor complied with the option contract. They also denied that the company had performed under its contract of sale to Schmidt. They also answered that the title held by the company is held subject to the judgment in the Schmidt Case, and that Johnstone had secured by transfer, sale, and assignment all of Schmidt's rights. They further challenged the option contract as unjust, unreasonable, uncertain, and nonmutual. They prayed no affirmative relief, except as contained in a general prayer.

The evidence established the facts following: That in 1906 Johnstone had contracted, with a predecessor in title of the company, for the purchase of the entire section 11; that he had shortly afterwards, during that year, gone into possession, claiming under his contract, and has maintained that possession; that in 1907 he recorded the above contract; that in 1908 the company contracted to sell the north half of section 11 to Schmidt for $4,000; that the company could not give possession to Schmidt, who paid down $1,920, and refused thereafter to pay further; that in 1909 the company, which had contracted to sell Johnstone all of section 11, and another, for the benefit of their grantees, brought suit, and in 1911 secured judgment against Johnstone in an action to quiet title to the southwest quarter of said section; that said contracting company and others, including the appellee, in 1909, began a similar suit against Johnstone for the southeast quarter of said section, and, pursuant to an adverse judgment therein, and the judgment for the southwest quarter, Johnstone surrendered possession of the two quarters in April, 1911; that in May, 1911, appellee secured from Schmidt an option, good until December 29, 1912, to purchase his equity in said north half of section 11 for $4,000, to be paid $2,000 on November 1, 1911, and $2,000 on November 1, 1912; that no payments were made under this option; that in September, 1912, appellee and others, including Schmidt and the Valley Company, "each and all for the use and benefit of said Andrew Schmidt," brought suit to quiet title against Johnstone to said north half of section 11; that April 1, 1913, Schmidt gave appellee another or "renewal" purchase option, by which appellee was to pay $4,000, $400 down, and the balance "on or prior to November 1, 1913," and the taxes for 1913, and upon such payments to receive a warranty deed from Schmidt for said north half; the contract further provided that in case of default on appellee's part "the money paid hereon shall be retained by Andrew Schmidt as liquidated damages for a breach thereof"; that the Schmidt suit came to trial in July, 1913, and Johnstone introduced as evidence therein the last option contract; that in said suit Johnstone, inter alia, in his answer set up the other two suits filed in 1909 as a bar, on the theory of a splitting of causes of action; that in August,

1913, a decree was entered in this Schmidt suit, based upon findings of fact and conclusions of law, to the effect that Johnstone had no right, title, or interest to said land, but that the fee title and right to possession were in some of the plaintiffs, other than Schmidt, held in trust for Schmidt, who had the equitable title; that November 21, 1913, appellee paid Schmidt $100 and in December, 1913, $50; that in January, 1914, Johnstone appealed the Schmidt Case to the state Supreme Court; that on May 5 and June 30, 1914, appellee paid Schmidt $100 and $400, respectively; that in May, 1915, the state Supreme Court affirmed the decree in the Schmidt Case; that June 5, 1915, appellee paid Schmidt $200; that prior to September 23, 1915, Johnstone sued out writ of error to the Supreme Court of the United States in the Schmidt Case; that appellee, on January 14, 1916, paid Schmidt $400; that from November, 1913, to May, 1916, Schmidt was insisting upon payment of the balance due him, and appellee was attempting to postpone and delay payment; that there was no further understanding between them, after November 1, 1913, as to when or in what amount payments to Schmidt should be made; that May 26, 1916, more than four months after the last payment to Schmidt, appellee, in response to an urgent demand from Schmidt for payment, wrote that it did not know when it could make further payment, but expected as soon as the Schmidt Case was finally disposed of in the Supreme Court of the United States to make a loan on the land and pay Schmidt in full; that June 6, 1916, Schmidt, for $3,000 cash, conveyed, transferred, and assigned all of his rights, title, and interest in said land and to the judgment in the Schmidt Case to Langley; that soon thereafter appellee learned of these transfers, and thereupon made tender to Langley; that soon thereafter Langley entered complete satisfaction of said judgment, and conveyed the land to William Johnstone; that both Langley and William Johnstone were acting solely as agents of John Johnstone, in whose behalf the title, interests, and rights so acquired are now held by William Johnstone; that in November, 1916, this suit was filed against Langley, and the Johnstones brought in by amended bill in May, 1917; that in November, 1917, the writ of error in the Schmidt Case was dismissed by the Supreme Court, under rule 10 thereof; that appellee had not paid the taxes for 1913, as called for by the second option contract, but in 1917 had offered to redeem the land, which had been sold for taxes of 1913 and a certificate therefor issued to Johnstone, who holds same; that at the time Johnstone, through Langley, secured Schmidt's title, rights, and interest, he knew the terms of the contract of sale from appellee to Schmidt, and that Schmidt had paid but $1,920 upon the purchase price thereunder; that Johnstone had never made any payments for this land under his contract of purchase of 1906, or upon any account, except $3,000 to Schmidt; that on June 15, 1916, Langley conveyed to William Johnstone what he had acquired from Schmidt; that November 29, 1916, appellee tendered Langley the unpaid balance under the option and demanded conveyance of the title, rights, and interest acquired by Langley from Schmidt; that said tender has been kept good, and was renewed at the trial of this case.

The trial court concluded that William Johnstone held the title acquired from Schmidt as agent and trustee for John Johnstone, who had expended certain found sums for taxes and permanent improvements; that such title was subject to the option contract; that upon payment by appellee of the balance, with interest due under that contract, and the sums expended for taxes and permanent improvements, the Johnstones should quitclaim said land to appellee, and appellee should be entitled to immediate possession. From that decree this appeal is brought.

F. C. Heffron, of Roseburg, Or. (C. L. Young, of Bismarck, N. D., on the brief), for appellants.

Harold Harris, of St. Paul, Minn. (T. F. Murtha, of Dickinson, N. D., on the brief), for appellee.

Before SANBORN and STONE, Circuit Judges, and MUNGER, District Judge.

PER CURIAM. [1] The extended litigation between these parties demands as complete determination as the facts and law will permit. The contents of the pleadings, which include general prayers for relief, afford full opportunity for the exercise of equitable powers. Under the admitted facts John Johnstone is the only defendant appellant having a real interest involved, so his rights and those of the appellee will be examined. Johnstone claims through two general sources—his continued adverse possession, and his acquired rights from Schmidt. The Schmidt Case involved the same defenses and contentions, so far as based upon Johnstone's possession, as are here urged. A court of competent jurisdiction denied all of those defenses and contentions, and that decision was affirmed by the highest appellate court of the state. If the result so determined was, in Johnstone's opinion, unjust, he had the right to have such reviewed by the Supreme Court of the United States. He brought his writ of error for that purpose. He later signified his intention to accept the result reached in the state courts, by abandoning the writ and permitting it to be dismissed by the Supreme Court. This was done after the present suit had been filed, and he had been made party thereto. To permit him again, in this action, to attempt to have those same contentions re-examined, would be to tolerate a trifling with the courts, and an extension of litigation already finally determined, which we will not countenance. All claims based upon his possession and his contract of 1906 with the Golden Valley Land & Cattle Company we regard as finally settled against him.

[2, 3] His acquirement of the Schmidt rights was complete. He stands in the shoes of Schmidt, entitled to the rights, and subject to the burdens and liabilities, of that position. A determination of those rights, burdens, and liabilities is to be found in the contract of sale by appellee to Schmidt, in the so-called option contract, given by Schmidt to appellee, and in what has been done under those contracts. The status of the former is that, after the initial payment of $1,920, Schmidt has refused further performance, because the appellee could not perform upon its part in respect to giving him possession. Neither party has ever treated this contract as repudiated or as abrogated, except as it would be necessarily if the option contract were performed. Appellee recognized an equitable title as existing in Schmidt, and sought to acquire that title, under the option contract, by payment of $4,000 therefor. Therefore the Schmidt purchase contract remains effective, unless the option contract is still effective, or unless there has been failure of performance by Schmidt or his transferees under the Schmidt purchase contract. The appellee contends that the option contract is in full force, and filed this suit for the purpose of enforcing its specific performance. While the cancellation of the Schmidt purchase contract is also asked, there is no offer to repay the $1,920 paid by Schmidt thereon, and it is clear from the petition that this relief was based and sought upon the theory that the enforced performance of the option contract would necessarily annul the purchase contract. The first inquiry, therefore, is as to the status of the option contract which is sought to be enforced specifically. This contract, while ex-

pressed as a "renewal" of an earlier option contract, which had expired, is not properly so, but is complete in itself, and in some respects inconsistent with the former option. The terms of this earlier option are not effective, and it will be disregarded. The option here involved is as follows:

"Received of Stondall Land & Investment Company the sum of four hundred ($400) dollars, for renewal the option that is hereby given to said Stondall Land & Investment Company, residing at St. Paul, Minnesota, to purchase within 7 months from the date hereof the following described lands: * * * For the sum of four thousand ($4,000) dollars to be paid in the following manner, to wit: Four hundred ($400) dollars as mentioned above; balance in installments from time to time without interest, all, however, to be paid on or prior to November 1, 1913. All of which sums are to bear interest from the date hereof at the rate of ———— per cent. per annum, payable annually. It is further agreed 'that the holder of this option shall pay all taxes and assessments levied or assessed on said land for the year A. D. 1913.

. "It is further agreed that in case of default hereof on the part of the said purchaser the money paid hereon shall be retained by Andrew Schmidt as liquidated damages for a breach hereof.

"It is hereby mutually agreed that the said purchaser shall have and receive a land contract, bond for deed, in the usual form, which shall set forth fully the terms of said sale and shall provide that on full compliance therewith the said purchaser shall be entitled to a warranty deed conveying said land free and clear of all encumbrances, as above set forth, reserving to the public an easement in such roads, or roads, across said lands as may already be in the public, and that said land contract shall be duly signed and executed by the parties hereto within seven months from the date hereof.

"Dated Stockton, Minn., April 1, 1913.                    Andrew Schmidt.

"In the presence of Harold Harris."

If this option was accepted and performed by appellee, it is entitled to the specific performance it here seeks; otherwise, not. The evidence is undisputed that no part of the balance of $3,600, required by the option to be paid by November 1, 1913, was ever paid by that date; but it is equally clear that after that date both appellee and Schmidt treated the contract as in force. The inevitable effect of this was a waiver by Schmidt of the condition that the balance should be paid by November 1, 1913. As no other date limit was considered by the parties, it must be taken that their intention was that the balance should be paid within a reasonable time. To this extent the option contract was modified. It is not claimed, and under the evidence could not be claimed, that any other requirement of that contract was ever altered. As thus amended, the contract required the payment of the balance of $3,600, in installments, within a reasonable time from November 1, 1913. Beginning shortly after this date, Schmidt commenced to urge payments by appellee. This he did persistently and strongly, being finally compelled to place the matter in the hands of an attorney, who conducted an insistent correspondence. In response to these repeated urgings appellee, clearly influenced by the pendency of the Schmidt suit, grudgingly paid as follows: November 21, 1913, $100; December, 1913, $50; May 5, 1914, $100; June 30, 1914, $400; December 1, 1914, $50; June 5, 1915, $200; January 14, 1916, $400. More than four months after this final payment, in response to a particularly urgent letter demanding further payment, appellee wrote

that it could not then state when it could make further payment, but would do so at the first opportunity, adding:

"As soon as the ruling has been made in Washington, which will be some time during the summer, and which we of course expect to be in our favor, we will make a loan on the land and pay the Schmidts their balance."

In 30 months it thus paid $1,300, or slightly over one-third of the $3,600 due to be paid within a reasonable time, and over 4 months after the last payment, after urgent demand, indefinitely postponed further payment. We cannot regard these acts as any compliance with the requirement of payment within a reasonable time. The option contract also required payment of the taxes for 1913. No attempt to do this was ever made, until long after the land had been sold for taxes, when appellee, in December, 1917, offered to redeem the land from the tax sale. The importance of this requirement to Schmidt is clear. Appellee did not perform. Thus appellee utterly failed to perform either of the only two things which the contract required it to do. It is therefore in no position to insist upon specific performance, or to object to Schmidt treating that contract as breached in essential particulars. He did so treat it as breached and at an end, when he transferred his title and interest in the land to Langley.

The annulment of the option contract left the parties where they were when that contract was made, subject, in so far as performance of that contract was concerned, to what had occurred since its execution. After the first payment by Schmidt he refused to further perform, until appellee placed him in possession, as required by that contract. Neither party treated the contract as terminated, and both acquiesced in the suspension of further performance, until appellee could place Schmidt in possession. This it was endeavoring to do in the Schmidt suit. When it should place Schmidt in possession, appellee would be in position to demand performance upon his part. Schmidt never secured possession, but when the transfers by him resulted in his rights being held for one who had actual possession, the contract in that regard might have been regarded as performed by appellee, had it not challenged both those rights and that possession by this action, which operates as a suspension of performance until this litigation is terminated. When it is terminated, appellee will be in position to demand performance of the purchase contract by those who have replaced Schmidt, and to protect itself if such performance is not promptly forthcoming.

[4] There is another substantial ground for the reversal of this decree. The option contract of April 1, 1913, was champertous and void under section 9406 of the Compiled Laws of North Dakota of 1913, which reads in this way:

"9406. *Buying Pretended Titles.*—Every person who buys or sells or in any manner procures, or makes or takes any promise or covenant to convey any pretended right or title to any lands or tenements, unless the grantor thereof or the person making such promise or covenant has been in possession, or he and those by whom he claims have been in possession of the same, or of the reversion and remainder thereof, or have taken the rents and profits thereof for the space of one year before such grant, conveyance, sale, promise or covenant made, is guilty of a misdemeanor."

264 F.—31

See Galbraith v. Payne, 12 N. D. 164, 169, 170, 172, 96 N. W. 258; Burke v. Scharf, 19 N. D. 227, 232, 124 N. W. 79; Dever v. Hagerty, 169 N. Y. 481, 484, 62 N. E. 586; Byrnjolfson v. Dagner et al., 15 N. D. 333, 336, 337, 338, 109 N. W. 320, 125 Am. St. Rep. 595.

Neither Schmidt, the grantor, nor the appellee, the grantee, in the option contract to convey Schmidt's alleged right to the land and to its possession, nor any of those under whom the appellee and Schmidt claim, had been in the possession of the north half of the section, or of the reversion or remainder thereof, or had taken the rents or profits thereof, for the space of one year before Schmidt's promise or covenant to convey his alleged right to the land was made. Johnstone was, and ever after 1906 had been, in the actual exclusive possession of this land. The contention of counsel for the appellee is not tenable that the option contract does not fall under the ban of this statute because (1) such covenants and promises are void only against those claiming adversely; and (2) because Johnstone claimed his right, title, and possession under his contract of January 15, 1906, with the Golden Valley Land & Cattle Company, the owner of this land at that time, and that, as he was estopped from denying his grantor's title, he was not claiming adversely to Schmidt, who was the grantor in the option contract. The question is: Was Johnstone claiming adversely to Schmidt when the latter made his option contract in 1913? Johnstone was undoubtedly estopped from denying that the Golden Valley Cattle Company had title to this land in 1906, when it made the contract with him, and he was also estopped from denying that its successor in interest, the appellee, did not acquire title to the land subject to his contract, but that was the extent of the estoppel against him. When Schmidt made his option contract, the appellee had repudiated Johnstone's contract of 1906 and his right to the land and to its possession thereunder, and had set up and was maintaining, by suits against Johnstone and by the contract it made with Schmidt, an alleged right to the title and possession of the land inconsistent with and adverse to Johnstone's contract for and his title and actual possession thereof under that contract. Johnstone was not estopped by that contract of 1906, and his claim to hold the right to the title and the actual possession under it, from making his adverse claim to that title and possession against the subsequent inconsistent claim of Schmidt initiated and maintained by the appellee. Against that claim, and against Schmidt and his claim under his contract, and against the appellee who was maintaining that claim and seeking to strike down thereby Johnstone's right, title, and claim to the land, and to its actual possession, which he held, Johnstone was therefore an adverse claimant, and the option contract was void.

With instructions to dismiss appellee's bill, with an equal division of the costs, the decree is reversed.